**BIG TOP USA, INC., Plaintiff,**

v.

**THE WITTERN GROUP; Fawn Vendor, Inc. d/b/a Selectivend National; O.K. Manufacturing; John Schofield; Sam's Club, a division of Wal–Mart Stores, Inc.; and Wal–Mart Stores, Inc., Defendants.**

**Civil Action No. 97–10316–PBS.**

United States District Court,
D. Massachusetts.

Feb. 6, 1998.

Robert E. McLaughlin, Jr., Gilman, McLaughlin & Hanrahan, Boston, MA, Deborah C. Frankel, Big Top USA, Inc., for Big Top USA, Inc.

Hayward L. Draper, Hansell & O'Brien, Des Moines, IA, John B. Tuffnell, Nyemaster, Goode, Voights, West, Hansell & O'Brien, Des Moines, IA, for Wittern Group and Fawn Vendors, Inc.

John Egan, Posternak, Blankstein & Lund, Boston, MA, for Selectivend.

Charles M. Furcolo, Andrew P. Botti, Burns & Levinson, Boston, MA, Blake T. Ostler, Burbidge, Carahan, Ostler & White, Salt Lake City, UT, for O.K. Manufacturing.

Hayward L. Draper, Hansell & O'Brien, Des Moines, IA, for John Schofield and Selectivend National.

Richard E. Quinby, Janice O. Fahey, Craig & Macauley, P.C., Boston, MA, Jon B. Comstock, Wal–Mart Stores, Inc., Legal Dept., for Wal–Mart Stores, Inc.

Richard E. Quinby, Janice O. Fahey, Craig & Macauley, P.C., Boston, MA, for Sam's Club.

## MEMORANDUM AND ORDER ON MOTION FOR A PRELIMINARY INJUNCTION

SARIS, District Judge.

### INTRODUCTION

This case is about a giant gumball machine with a circus theme. Plaintiff Big Top USA, Inc. ("Big Top") developed and marketed a 82–inch tall, 300–pound gumball vending and amusement machine for operation in retail locations. Poised, or so its principals thought, to place its mouth-catching machines in Wal–Mart stores across the United States, Big Top suddenly found itself losing major potential buyers. It attributes its dire financial straits to a strikingly similar "knock-off" gumball machine called "Circus World", which was manufactured for sale by defendant O.K. Manufacturing, Inc. ("O.K.") and was sold at half the price of Big Top's machine to the same vendors actively sought out by Big Top.

In a complaint filed in state court, Big Top asserted several tort and contract claims [1] against O.K. and a vending machine broker, Selectivend National ("Selectivend"). After the defendants removed the case here on diversity grounds, Big Top amended its complaint to add Wal–Mart Stores, Inc. ("Wal–Mart") and Sam's Club, a division of Wal–Mart, as defendants and to add a federal claim for trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a). Big Top then moved for a preliminary injunction.[2] Relying both on its claim that its unpatented product design deserves federal trade dress protection and on all of its state claims, Big Top asks the Court to enjoin the manufacture, sale and distribution of two O.K. gumball machines and to require the removal of O.K. machines from Wal–Mart stores. After several hearings, that motion is **DENIED** on the grounds that Big Top has failed under the Lanham Act to demonstrate likelihood of confusion among the primary purchasers of these expensive machines, vending machine vendors, and that it has failed to demonstrate irreparable harm necessary for preliminary injunctive relief on its state claims.

### FINDINGS OF FACT

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact, which

---

1. Big Top alleges "fraud, interference with advantageous and contractual relationships, unfair competition, tortious interference, breach of contract and claims cognizable under M.G.L. Ch. 93A, Section 11 ...." (First Am. Compl. at 1.)

2. This Court initially denied the motion with respect to Wal–Mart and Sam's Club based on a misrepresentation of fact by defendants. When defendants informed the Court of their error, the Court allowed Big Top's motion to reconsider and now addresses afresh the motion as against all parties.

"do not bind the Court in subsequent proceedings." *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 545 (1st Cir.1996). The findings are based on the admissible evidence which the Court was able to draw from a disjointed record consisting of at least 30 affidavits, three separate evidentiary hearings on August 12, September 25, and October 20, 1997, several documents and photographs, two videotapes and two live gumball machine demonstrations.

### 1. *Big Top and Its Gumball Machine*

Big Top is a relatively new Massachusetts corporation with its principal place of business in Chelsea, Massachusetts. The corporation was formed for the purpose of developing, manufacturing and selling the large circus-theme gumball machine ("Big Top Gumball") that is the subject of this litigation and Big Top's sole product to date. Previously, Big Top had not established a market identity in the gumball vending machine industry. Big Top's Chairman and Director of Product Development, Bill Ranney, Sr. ("Ranney Sr."), envisioned a machine that would combine gumball delivery with an entertaining multi-gumball show. He and his son, William Ranney, Jr. ("Ranney Jr."), Big Top's President, poured their energies into developing an attention-grabbing and innovative product. The Ranneys thought that Big Top Gumball would revolutionize the market for gumball machines, which, like other vending machines, can typically be found in retail stores and other businesses including, for example, malls and professional offices. Big Top does not hold a patent on Big Top Gumball or any of its components, but it states that it has applied for patent protection.

A photograph of Big Top Gumball as it appeared on January 23, 1997, is attached to this opinion as Appendix A. The machine stands 82 inches tall and is visually composed of three sections. The base, which makes up the lower one-third of the machine, has a trapezoidal footprint. The middle section, which is slightly wider and accounts for roughly half of Big Top Gumball's height, is the showcase for the multi-gumball show. The top section, referred to as a "volcano top", is a clear tent-shaped storage area for thousands of gumballs and is topped by a large red ball evocative of a huge gumball or a clown's nose. The total capacity of the machine is 6,000 one-inch diameter gumballs. Big Top Gumball, the frame of which is constructed of heavy 16 gauge steel, weighs 175 pounds empty and 300 pounds at capacity.

Big Top Gumball's gumball entertainment and delivery system is housed within the middle showcase section. The system is surrounded by a clear high-impact acrylic "wraparound screen". There are no vertical supports at the two front corners of the machine, which results in an unobstructed view of the gumball system from all sides. The system itself is dominated by a large spiral gumball track apparatus symmetrically centered on an invisible vertical axis above an eight-inch diameter red plastic funnel. The tracks are made up of three metal cables that are bound together to allow gumballs to roll down the spiral. A "reservoir" of gumballs covers the bottom of the showcase to a depth of about six or eight inches. The system includes several yellow chains (which look like bicycle chains) constituting a conveyor system as well as two plastic "fill tubes", all of which run the entire height of the showcase. The show, which usually costs a quarter, runs for 20 seconds, during which a sound chip plays circus music and 20 "show" gumballs move about the system before a single gumball is vended to the customer. Sound chips with other themes, for example, Christmas music, may be substituted for the circus chip. There have been some recent modifications to the slope of the gumball track.

The Court was presented, either live or through photographs or videos, with at least four views of Big Top Gumball, including the one in Appendix A. Though the machine's basic structure and the spiral gumball system look the same in each presentation, the decoration and ornamentation of Big Top Gumball changes slightly from view to view. The principal color of Big Top Gumball is usually to the orange side of red, and the machine is always dominated by a prominent circus theme. The relatively minor differ-

ences in decoration are found on the three horizontal metal bands at the top and bottom of the clear showcase screen and just beneath the large ball, on the base ·of the machine and, on occasion, in the ornamentation within the gumball system itself.

The horizontal bands typically display the name of the machine, but their exact wording and appearance varies. In the view shown in Appendix A, the top band is decorated with an orange-red and yellow design resembling stage curtains and reads "BIG TOP GUMBALL" in large blue .capital letters with white trim. In other views, the top band is alternatively (i) yellow without words and with a cherry and multi-colored balloon motif, (ii) yellow, reading "THE GREATEST GUMBALL SHOW ON EARTH" or (iii) covered with a larger red màrquis reading "RINGLING BROS. AND BARNUM & BAILEY" around a globe containing the tag line, "THE GREATEST SHOW ON EARTH".[3] The bottom band of the view in Appendix A has the curtain pattern and says "THE GREATEST GUMBALL SHOW ON EARTH" in smaller blue capital letters without trim, but in other views the lower band says "BIG TOP GUMBALL" with "25¢" within a blue star to either side or, on the "Ringling Brothers" version, is colored yellow, green· and purple with the faces of nine clowns across its face and "25¢" written in blue to either side. The band just underneath the ball on top of the machine is alternatively plain yellow, yellow with a red cherry and multicolored balloon motif, or red with clowns and balloons.

The decoration of the base of the machine changes from view to view as well. The view in Appendix A is the least decorated, as it is simply painted orange-red with an unembellished small orange 25¢ sticker next to the coin mechanism. Other views are more ornate. One is a slightly different shade of red with the words "BIG TOP GUMBALL" above a clown centered on the front of the base. On each of the side panels of the base is a horse (or perhaps a zebra), and the bottom of the base is lined with balloons.

The base of· the "Ringling Brothers" view is ornately decorated with trumpeting jesters, elephants, circus tents, stagecoaches, rhinoceroses and the like.

Perched about the gumball spiral in all versions of Big Top Gumball is a menagerie of animal figurines, such as a giraffe, an elephant, a lion and a koala bear, among others. By admission of Ranney Sr., Big Top changes the figurines it puts in its machines from time to time. Each of the views presented to the Court presents a slightly different herd of animals. Ranney Sr. told the Court that Big Top's developers routinely improve Big Top Gumball's "graphics", meaning the animals and the decorations.

### 2. *Big Top's Efforts to Sell Directly to Vendors*

.As of August 1997, over 400 Big Top Gumball machines had been purchased and delivered. Big Top sold at least some significant percentage of these machines directly to vending machine "vendors". .A vendor purchases machines and operates them at locations within the businesses of others. He typically pays a business in which he places his machines a fee, which is a percentage of vending sales from the particular machines. Big Top presented evidence of three such vendors who purchased Big Top Gumball. James Hammond of New England Jet Stream, a Massachusetts vendor, purchased nine Big Top Gumball machines and placed them in Wal–Mart stores in western Massachusetts and New Hampshire.[4] Chuck Kays of Kays Enterprises bought eighteen machines, which he placed in malls and at state fairs in Oklahoma. Folz Vending Co. of New York, a larger "bulk vendor", purchased at least two Big Top Gumball machines, one of which was placed. at a Toys 'R' Us store. Big Top's asking price for its machine to these direct customers was slightly less than $4,000.

Big Top claims that, in addition to vendors, it also markets Big Top Gumball to "small

---

**3.** Ringling Brothers licensed Big Top to use its trademark on Big Top Gumball.

**4.** Hammond's placement of Big Top Gumball in these Wal–Marts was "unauthorized" by Wal–Mart Stores, Inc. Wal–Mart's vendor authorization procedures are discussed fully *infra*.

individual 'mom and pop' customers". These customers would include stores and professional offices, for example, that wished to own and operate Big Top Gumball on their own premises. Big Top has not offered any admissible evidence of actual sales to this wider market of non-vendors. The only evidence in the record of involvement by store owners or managers in the gumball business is their allowing machines to be placed in their stores by vendors, rather than their purchasing Big Top Gumball themselves.

A complete picture of Big Top's direct marketing efforts has not emerged from the preliminary record. Big Top has advertised Big Top Gumball in the *Vending Times,* a trade magazine; the machine was featured in an article in the same magazine in late 1995. Big Top displayed Big Top Gumball in 35 trade shows,[5] some of which were associated with Big Top's membership in the International Association of Amusement Parks and Attractions. Some of the shows were directed at retail stores such as supermarkets, and non-vendor representatives of these stores attended. The Court has no evidence of sales arising from these shows. Also, Big Top is not noted as a manufacturer of bulk vending products in the 1997 *Vending Times Buyer's Guide,* a leading trade magazine for the bulk vending industry.

3. *Efforts to Expand Big Top Gumball's Market By Using Brokers*

During the spring of 1996, Big Top sought to augment its direct sales of Big Top Gumball by selling through a broker, Selectivend. Selectivend is a division of Fawn Vendor, Inc., an Iowa corporation that is owned by The Wittern Group. John Schofield is the Division Director of Selectivend. As a broker, Selectivend, for a fee, arranges sales of gumball machines by manufacturers to vendors or wholesalers. Schofield proposed to sell large numbers of Big Top Gumball to Sam's Club, a members-only wholesale club, for further sale to a larger market of vendors. Sam's Club, a division of Wal–Mart, sells goods out of its 436 stores nationwide and through a Special Order Catalog. The

members of Sam's Club are generally businesses, including vendors. Among the goods sold by Sam's Club are gumball machines and the gumballs to refill them. Sam's Club buys gumball machines using brokers, including Selectivend, but it also is able to buy gumball machines directly from manufacturers for further sale.

When Big Top and Selectivend agreed to undertake the Sam's Club venture, Schofield made sales estimates which, if accurate, would have represented exponential growth in Big Top sales and revenues. On April 17, 1996, Ranney Jr. and Selectivend's president signed an "Exclusive Distributorship" agreement targeted toward Sam's Club and similar wholesalers. In a letter to Ranney Jr. dated the next day, Schofield estimated that Selectivend could sell over 5,000 machines per year for Big Top through Sam's Club's Special Order program. About a month later, Schofield sent Big Top a "letter of intent", in which he estimated that "we could see seven to ten million dollars worth of sales in 1997 with the Big Top Gumball machine." Schofield wrote that a number of "preferred member vendors" of Sam's Club had "agreed to purchase Big Top Gumball machines through Sam's immediately upon availability of equipment." A Selectivend memo indicates that it would "buy" Big Top Gumball for $2,600 per machine and "sell" them for between $3,295 and $3,495.

Despite extensive marketing efforts, the arrangement with Selectivend was unsuccessful. Big Top Gumball was displayed by Selectivend at the Sam's Club booth at the Spring 1996 trade show of the National Restaurant Association and at eight to ten Sam's Club seminars at a cost of $100,000 to Big Top. Big Top and Selectivend were listed in a Sam's Club brochure promoting its 1997 schedule of "Vend Mart Seminars." Additionally, the machine was featured prominently at the Selectivend booth at the 1996 Wal–Mart stockholders' meeting in Arkansas (held in or around April 1996). Nevertheless, on October 28, 1996, Big Top terminated the distributorship agreement because Selectivend had not yet brokered a single sale to

---

**5.** Many of these trade shows were attended by representatives of defendant O.K. In its briefs, Big Top claims to have spent about $750,000 to market Big Top Gumball at these shows.

Sam's Club or anyone else. According to Schofield, no sales were made because of the refusal of Big Top to provide manufacturing and financial information necessary to demonstrate that Big Top had the ability to produce machines in the quantity that would be required by the wholesale clubs. Big Top has had no business association with Schofield since the termination of the agreement.

After Selectivend exited the stage, Sam's Club pursued the sale of Big Top Gumball through its club without the use of a broker. At an October 1996 meeting, Sam's Club and Big Top signed a "Vendor Agreement" which, on its face, purports to do nothing more than assign Big Top Gumball a Sam's Club item number. The agreement does not include a price term or a quantity term and includes the following prominent disclaimer: "THIS VENDOR AGREEMENT AND OTHER TERMS, CONDITIONS AND STANDARDS INCORPORATED HEREIN DO NOT CREATE AN OBLIGATION FOR PURCHASER TO PURCHASER [sic] MERCHANDISE OR OTHER GOODS." However, apart from the Vendor Agreement itself, Sam's Club gave clear indications that it intended to market Big Top Gumball through its clubs. Mark Griffith of Sam's Club described Big Top Gumball as "the most exciting New Product to ever be offered in Bulk Vending" and anticipated "tremendous profits". Sales projections of Big Top Gumball through Sam's Club were as high as $18 million per year.[6] Big Top Gumball actually appears *on the cover* of Sam's Club 1997 catalog, and it is listed for sale therein with a Sam's Club item number. At some point in time, Big Top Gumball was one of only two vending machine programs approved for "display sales" at Sam's Club stores. In the spring of 1996, at least one machine had been placed in a Sam's Club store in Saugus, Massachusetts, for a period of four days. Rex Trailer, of erstwhile Boston local children's television fame for his role in Boomtown, pitched the machine in a promotional video filmed in a Sam's Club store.

By far the most substantial promotional undertaking by Sam's Club was its effort to encourage Wal–Mart to approve Big Top Gumball for operation in Wal–Mart store vestibules. Wal–Mart is a national chain of about 2,400 general retail stores, all of which are owned by the corporation. Wal–Mart, which does *not* own or operate gumball machines itself, authorizes a small group of vendors to place gumball machines, which have been pre-approved by Wal–Mart, in the front vestibules of its stores. Wal–Mart exercises complete control over the front foyers of its stores. Seven vendors, "the Big Seven", dominate placements of bulk vending machines in Wal–Marts. Despite the fact that Sam's Club is a division of Wal–Mart, these authorized vendors are not required to buy approved machines through Sam's Club. In fact, the vendors tend *not* to buy through Sam's Club because of the additional middleman cost.

In late October 1996, Michael Converso of Sam's Club and the Ranneys met with David Graham, Wal–Mart's Director of Other Income, at Wal–Mart headquarters in Arkansas to discuss Wal–Mart's potential approval of Big Top Gumball for vendor purchase. At about the same time, a Big Top Gumball machine was delivered to Wal–Mart headquarters for testing. Excited about the machine, Graham expressed an interest in having one in every Wal–Mart store. A special price of $3,000 per machine, a discount of about $500 off the Sam's Club price, was discussed.

Graham agreed to approve Big Top Gumball for Wal–Mart placement. According to Graham, this approval merely *allowed* vendors the option of buying Big Top Gumball for placement in Wal–Marts; it did not guarantee any of them would do so. Converso asserts, however, that "Graham had complete control over that program at Wal–Mart, and if David Graham said he wanted something, typically he got it, period." The Court cannot resolve this dispute on the present record, but it does seem clear that Graham never agreed to grant Big Top an exclusive

6. The $18 million figure was based on a projection of the sale of one Big Top Gumball machine per month in each of the 436 Sam's Club stores.

arrangement with Wal–Mart. As a way of introducing Big Top Gumball and other approved vending machines to Wal–Mart's authorized vendors, Graham hosted a vendor meeting in November 1996. Several if not all of the Big Seven authorized vendors attended the meeting, and those present objected strenuously to Sam's Club's $3,000 price tag on Big Top Gumball. The vendors wanted to pay only between $2,000 and $2,500 for the machine. No sales of Big Top Gumball were completed.

Though price was the principal complaint about Big Top Gumball lodged by the vendors, they also called the machine's reliability into question. The machine was at Wal–Mart's headquarters for a three month period. Graham states he observed problems with gumball delivery in the Big Top Gumball test unit during November 1996, including at the vendor meeting itself. Converso claims there was only a minor problem stemming from a defective gumball that "wasn't completely round." Graham, however, was not the only one to notice problems. Tyler Sumners, Vice President of Service Vending Company, tested another Big Top Gumball machine during the same period and returned it because of serious functional problems, including security weaknesses and frequent failures of the machine to vend gumballs. For example, he said gumballs would constantly hang up in the front and back of the machine, a problem which is "especially serious because if persons attempt to purchase gumballs and do not receive them then the machine quickly gains a reputation for being worthless." Bolstering these complaints is the statement of John Phillip Welch, a former Big Top employee and current owner of a vending business, who testified that Big Top took numerous customer orders which it failed to deliver.

Two of Big Top's three direct customers in the record also noted problems. Chuck Kays, who had initially been euphoric about Big Top Gumball and who had written that the income from Big Top Gumball at his locations was "staggering" (approximately $25,000 a month), bought five used machines from which to salvage parts to maintain the eighteen machines he had purchased from Big Top. Kays states that Big Top gumball machines are unreliable and "difficult to keep in operation." Folz Vending sent back to Big Top some machines which it had purchased due to mechanical problems, and it never purchased another Big Top Gumball machine. Hammond alone offers unequivocal praise for Big Top Gumball, which provided him with a steady stream of trouble-free income from nine machines over a seven-month period.

### 4. O.K. and Its Circus World Prototype Gumball Machine

In the fall of 1996, while Big Top Gumball was being pitched to Wal–Mart's major vendors, another gumball machine manufacturer made its entrance into the ring. J.C.O., Inc., doing business as O.K. Manufacturing ("O.K."), is a Utah corporation headquartered in Salt Lake City. Since 1992, O.K. has manufactured and sold several "theme show" gumball machines. O.K. manufactures its gumball vending machines primarily through trade shows to bulk vendors. Some of its machines manufactured prior to 1995, such as the Gumball Park and the Magician, have certain design features similar to Big Top Gumball, for example, gumballs that run along a visible internal track. Indeed, at the end of 1994 and beginning of 1995, O.K. manufactured the "Road Runner", a gumball machine with a spiral track. Incidentally, Road Runner was sold at wholesale clubs for half the price of its competition, the "Gumball Wizard". The manufacturer of Gumball Wizard, Global Gumball, Inc., stated that the customers reordering Gumball Wizard dropped between 25% and 35% following O.K.'s manufacture of Road Runner.

O.K.'s involvement with the other parties to this case began when it was asked by Kays, and perhaps others, if they could design a machine similar to Big Top Gumball "that would be less expensive and more reliable than the Big Top Gumball machines [Kays] own[s]." Kays actually shipped a Big Top Gumball machine to the O.K. headquarters in November 1996. Kays states he was acting on his own initiative and was not prompted to contact O.K. by anyone. O.K., however, has indicated that it contacted Se-

lectivend to get a Big Top machine, and Selectivend referred it to Kays.

O.K. accepted Kays' knock-off challenge. In a November 7, 1996 letter to Graham at Wal–Mart, O.K.'s President, Jeff Ostler, eager for Wal–Mart's business, wrote that some unidentified companies had asked O.K. "to manufacture a cheaper machine for them." He said that O.K. had been studying the new "Electronic Gumball machine" market, had "sold thousands of machines through Sam's Club," and had been approached by Selectivend "to manufacture a machine to take to Sam's." In the letter, Ostler ridiculed the proposed Big Top—Selectivend—Sam's Club arrangement in strong terms:

> We were perplexed because we told John [Schofield] that if the [Big Top Gumball] machine proved to be the winner out of the electronic machines, we would copy it's [sic] concepts and deliver one to him for about half the costs of the Big Top. Talk of a patent, and making $20,000.00 in one month just made us laugh. First off, we had just been through a patent proceeding with one of [our] competitors and we know that Big Top didn't have one. Even if they did it would be simple to engineer around.

In the letter, O.K.'s president seemingly responded to the Big Top's sales campaign at Wal–Mart by declaring that "we decided to make a machine based on the concepts used in the Big Top machine." Finally, Ostler concluded, "Will we manufacture the Big Top machine? It's a cinch that if it's working and given the figures that are above that we will manufacture a like type machine."

The paths of O.K. and Big Top would cross at a second Wal–Mart vendor meeting, held at a hotel near the Wal–Mart headquarters in Arkansas on January 23, 1997. Graham invited nine vending machine manufacturers, including O.K. and Big Top. Several, if not all, of Wal–Mart's Big Seven vendors and about one third of the bulk vending industry attended the meeting. Because of the vendors' negative reaction to the high price of

the Big Top Gumball machine at the November 1996 meeting, Graham arranged the meeting to afford the vendors the opportunity to see an array of entertainment-related machines at competitive prices.

O.K. dramatically unveiled a preliminary version of its "Circus World" gumball machine (the "Circus World Prototype") at the meeting. Ranney Sr. claims that the Circus World Prototype was actually his machine, "placed in a different cabinet." Though Big Top presented no evidence indicating that the Circus World Prototype was just a painted-over Big Top Gumball machine on January 23, O.K. admits that elements of Big Top Gumball were physically used by O.K. as components of its model machine.[7] O.K.'s Vice President, Kurt Ostler, originally maintained that "[e]ach part of the Circus World [Prototype] machine was separately made, designed and manufactured by O.K." Later, however, counsel for O.K. twice represented to the Court that O.K. used some parts from the Big Top Gumball machine which Kays had shipped to them. Andrew Botti, attorney for O.K., told the Court that "[s]ome of the elements were taken and modified and put into the model, not as many as they say. Some of them were." Later, Botti confirmed that "there are a couple of parts that we did take out of his machine ... [a]nd we put them in our machine.... [W]e modified them, we put them in our machine." Blake Ostler, another counsel for O.K. and the brother of Kurt and Jeff, represented to the Court that only two parts from Big Top Gumball were used and that both were "already parts that we ordered." Graham, for his part, insists that he did not know what O.K.'s machine would look like before the January 23 meeting.

Even if O.K. used only a few parts from Big Top Gumball, the overall similarity between Big Top Gumball and the Circus World Prototype as they appeared on January 23 is striking. A February 19, 1997

---

**7.** Big Top presented a letter from Quick Silver, a "development company", comparing the two machines. Because the document was not authenticated and the Court has no means of assessing the reliability of this hearsay declaration, it does not consider it. One possible cause of confusion is that both companies apparently use parts manufactured by Quick Silver. For purposes of this proceeding, I will assume that some of the parts in the Circus World Prototype came from Big Top Gumball.

video of a side-by-side comparison of Big Top Gumball and the Circus World Prototype reveals only two obvious structural differences: the band at the bottom of the showcase is taller, and the base is six-sided rather than four-sided. Otherwise, the Circus World Prototype, painted red, is merely decorated differently than Big Top Gumball, with the name "CIRCUS WORLD" in yellow across the top band and "WORLD'S GREATEST GUMBALL SHOW" painted in blue on the front of the base around an elephant balanced on a ball. According to Ranney Sr., it even had the same circus animals, same sound chip, and same positioning of the funnel. The Circus World Prototype appears virtually to be a clone of Big Top Gumball to the unsophisticated eye.

## 5. The Release of O.K.'s New Machine to the Market

The Circus World Prototype machine that was presented to Wal–Mart and the vendors at the January 23 meeting was never sold by O.K. Kurt Ostler maintains that the "sole purpose of the machine was to demonstrate that O.K. had developed a like-type circus theme gumball machine ... that worked well and could be massed [sic] produced at a low price." After the January 23 meeting, O.K. made some changes to Circus World. Within months, O.K. had released a modified Circus World and a follow-on gumball machine, the Gumball Coaster, pictures of which are attached to this opinion as Appendix B. The machines have a retail price of between $1,900 and $2,495 each, substantially less than any price offered by Big Top for its machine.

Current versions of Circus World and Gumball Coaster, which are structurally the same machine, also look strikingly similar to Big Top Gumball, but several changes are apparent. The "volcano" top of the machines now lacks the prominent ball and instead is open to the air. There are no animal figurines in either showcase. The spiral gumball apparatus follows a slightly different pattern than that of the Circus World Prototype, and

there are two funnels within the spiral apparatus instead of one. The gumball tracks consist of four clear plastic cords held together by prominent clear plastic rings. The painted decoration of Circus World, however, is unchanged from the prototype version.[8] Gumball Coaster, in contrast, features a roller coaster theme instead of a circus theme. Its base and bands are painted blue. The words "GUMBALL COASTER" are printed aggressively in yellow across the top band. On the base is a painted roller coaster with "OK" on the car and "THE ULTIMATE GUMBALL RIDE" in red above, with exploding fireworks to either side. On the base of each Circus World and Gumball Coaster machine is a small O.K. Manufacturing name plate.

The Court was presented with photographs of least seven other gumball machines employing spiral mechanisms in their showcases. (K. Ostler Aff.) The machines were manufactured by other companies with the exception of one other O.K. machine, the Magician. Each machine bears little similarity to Big Top Gumball, Circus World and Gumball Coaster.

As of July 1997, O.K. had sold approximately 130 Circus World and Gumball Coaster machines, apparently all to vendors. It has spent $4,500 to advertise its products. At least several of the machines have been purchased by vendors who are former customers of Big Top or who were interested in Big Top Gumball. Neither Sam's Club nor Wal–Mart has purchased any Circus World machines, and Sam's Club has neither given Circus World or Gumball Coaster an item number, placed either machine in its catalog, nor proposed to display it for sale on its floors. However, at least eight Gumball Coaster machines, all owned by vendors, are currently in operation in Wal–Mart stores in New Jersey, Pennsylvania, Colorado and Missouri. Selectivend markets and processes orders for Circus World and Gumball Coaster machines on behalf of O.K.

Big Top's hopes of a sales breakthrough evaporated early in 1997. None of Wal–

---

8. According to the vendor Welch, those who are sophisticated in the gumball machine industry would also distinguish the machines based on the fact that O.K. uses three motors rather than one as on Big Top Gumball.

Mart's authorized vendors ever placed a Big Top Gumball machine in a Wal–Mart store. Graham ordered the nine Big Top Gumball machines owned by Hammond to be removed from their New England Wal–Mart locations in early 1997 because Hammond's company was not an authorized vendor. Sam's Club discontinued Big Top Gumball from the Special Order program in March 1997 because, according to Judy Henson, the Electronics Sales and Development Manager for Sam's Club, Big Top never provided Sam's Club with "an acceptable, fully operational machine".[9] Sam's Club Special Order catalog customers seeking information on Big Top Gumball have been referred to another machine. A potential sale of Big Top Gumball through Sam's Club on March 10, 1997 to Adventure Vending of Natick, Massachusetts was never completed. Big Top claims that its sales "have slumped by approximately 75%" since January 1997 and that it is now "struggling to survive."

The vendors who offered testimony to the Court claim never to have confused the product of O.K. with the product of Big Top. Kays says he "never had any misunderstanding of the difference between Big Top USA, Inc. and its products and O.K. Manufacturing and its products." Sumners, of Service Vending, agrees that Big Top Gumball and Circus World are "obviously different and distinguishable." Two Big Top employees, however, claim that 25 individuals have called Big Top headquarters inquiring whether Circus World was sold by Big Top, and whether they were the same machine. Additionally, Ranney Sr. recalled a conversation with a Star Market "representative" indicating that he thought a vendor was placing a gumball machine manufactured by Big Top in his stores when, in fact, the vendor-owned machine had been manufactured by O.K.

Ranney Sr. acknowledges that most, if not all, of his former or potential customers "see the same machine at half the price" and have therefore been lured away. He concedes that bulk vendors know that they are buying a cheaper version of the "same machine" from O.K., *not* from Big Top. Ranney Sr. himself told the Court that the bulk vendors "know it's the same machine at half the price made by the knock-off company, O.K.... The moment [O.K.] moved [its] fraudulent machine in, my doors were closed because [the bulk vendors] knew that [O.K.] could copy my machine exactly and [it] would take whatever heat that would be necessary."

## CONCLUSIONS OF LAW [10]

Big Top presses its motion for preliminary injunction based on the federal Lanham Act and several state tort and contract claims.

### 1. LANHAM ACT

Big Top alleges that the defendants violated the Lanham Act, 15 U.S.C. § 1125(a),[11] by manufacturing or encouraging and assisting in the manufacture of O.K.'s Circus World and Gumball Coaster gumball machines. The Lanham Act "exist[s] largely to protect the public from confusion [about] the actual source of goods or services." *International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996). The

---

9. Converso testified that the real reason Sam's Club pulled out was that Henson had a personality conflict with Ranney Sr. and had a "credit problem" with his business. This factual dispute is impossible to resolve on this record.

10. The portions of this opinion delineating the legal standards for preliminary injunctions in Lanham Act cases and the determination of distinctiveness in such cases are substantially the same as the analogous portions of this Court's recent decision in *Lainer v. Bandwagon, Inc.*, 983 F.Supp. 292 (D.Mass.1997) (Saris, J.) (order denying preliminary injunction).

11. The relevant portion of the Lanham Act, 15 U.S.C. § 1125(a) (1996) reads:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in trade or commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

protections of the Lanham Act apply with equal force to trademark infringement and trade dress infringement, which is alleged in this case. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 2759–60, 120 L.Ed.2d 615 (1992). "Trade dress has been defined as 'the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the customer.'" *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir.1997) (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997)). In other words, though trade dress historically was associated with the ways in which a manufacturer "dressed up" its product for marketing and sale, trade dress today is also understood to encompass actual product configuration, including elements such as its features, shape, size and color. *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8.4 (4th ed. 1996) ("McCarthy").

■ In order to be successful in a motion for a preliminary injunction in a Lanham Act trade dress case, the moving party must establish that "(1) it has a substantial likelihood of success on the merits, (2) there exists, absent the injunction, a significant risk of irreparable harm, (3) the balance of hardships tilts in its favor, and (4) granting the injunction will not negatively affect the public interest." *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir. 1996). Big Top has the burden of making each of these showings. *See International Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines, Inc.*, 826 F.2d 1141, 1144–45 (1st Cir.1987) (citing *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981)). "In a trademark case, the key issue is the likelihood of success on the merits because the other decisions will likely flow from that ruling." *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989); *see also Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir.1995) ("The central issue ... with most preliminary injunction trademark cases ... is whether plaintiff demonstrated a likelihood of success on the merits.")

■ In considering Big Top's likelihood of success on the merits, it is important to remember that not all trade dress is protected from copying. "On the one hand ..., trademark law allows a producer to prohibit the copying of a product feature which serves as a signifier of source in order to preserve his reputation and the goodwill consumers have for his brand. On the other hand, effective competition and the penumbra of the patent laws require that competitors be able to slavishly copy the design of a successful product." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658 (7th Cir.1995). "Copying is not only good, it is a federal right—a necessary complement to the patent system's grant of limited monopolies." *Id.* at 657. "One has the right to ape—if he can—the unpatented product of another." *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir.1987). In other words, the Lanham Act does not protect "inventions", which can only be protected by the patent laws.

■ The First Circuit requires that, to establish a substantial likelihood of success on the merits of a trade dress infringement claim, Big Top must prove "(1) that its design is inherently distinctive or has acquired a secondary meaning, and (2) that there is a likelihood that prospective purchasers of [gumball machines] will be confused as to the source of the [Circus World or Gumball Coaster machines].... Whether a violation ultimately exists will also depend on the functionality of the copied design." *TEC Eng'g*, 82 F.3d at 545–46 (citing *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58). "Only nonfunctional, distinctive trade dress is protected" by the Lanham Act. *Two Pesos*, 505 U.S. at 775, 112 S.Ct. at 2760–61; *see also Chrysler*, 118 F.3d at 58; *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 257 (5th Cir.1997). The Court considers Big Top's claim of direct infringement against O.K. before considering the possibility of a claim against the other defendants on a theory of "contributory infringement". *See Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir.1991) (holding those who encourage trade dress infringement liable under the Lanham Act).

## A. *Functionality*

■ The doctrine of functionality essentially defines the border between patent law and trademark law. Lanham Act protection of trade dress, though it encompasses the "overall" appearance and image of a product, does not extend to functional attributes of the product. This limitation "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995). "It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time...." *Id.* As such, functional features which are "not the subject of a valid patent or copyright may be imitated with impunity." *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir.1980).

■ A product feature is functional " 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165, 115 S.Ct. at 1304 (quoting *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982)). A non-functional attribute, in contrast, may be described as "a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product ...." *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 790 (8th Cir.1995) (citations omitted).

The First Circuit has not decided which party bears the burden of proving or disproving functionality. *See TEC Eng'g*, 82 F.3d at 546 n. 3; *Fisher Stoves*, 626 F.2d at 195–96 (ruling that placement of burden on plaintiff was not error, but declining to decide because burden placement did not affect the result). Other circuits disagree whether plaintiffs must prove non-functionality as part of their prima facie case or defendants must prove functionality as an affirmative defense. *Compare Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 199 (3d Cir.1995) *and Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir.1994) (burden on plaintiff) *with Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006 (2d Cir.1995) (burden on defendant). Because the extent of Big Top Gumball's non-functional trade dress is clear to the Court, it is unnecessary to resolve the issue of burden placement.

■ There are many features of Big Top Gumball which are non-functional because they are included for "identification and individuality" or are "unrelated to basic consumer demands." At a minimum, these features include: the overall circus theme; the large red ball on top; the shape of the "volcano" and one's ability to see stored gumballs within; the shape and size of the showcase; the lack of vertical supports in the front corners of the clear wraparound screen; the accompanying music; the perched animal figurines; and the shape of the base. The decoration of Big Top Gumball is also non-functional, despite the fact that Big Top has changed it frequently.

On the other hand, the individual features Big Top seems most eager to protect are functional. Big Top focused much of its evidence and argument on the unique innovation represented by its machine's entertainment extravaganza. Ranney Sr. spoke proudly of the fact that his was the first gumball machine to use 20 gumballs in a show, separate from delivery. He then described the chains, the tracks, the motor and the flow-through tubes that enable Big Top Gumball to create this show. But try as Big Top might, it cannot protect its "invention" from copying under the Lanham Act but rather can only seek protection for the *trade dress* of that invention. The elements that Ranney Sr. listed are "essential to the use or purpose of the article," that is, a multi-gumball show preceding the delivery of a single gumball. *See Qualitex*, 514 U.S. at 165, 115 S.Ct. at 1304. As such, they are perfect examples of components that, individually, would fall outside the scope of Lanham Act protection because they are functional features.

However, the "trade dress" that Big Top may validly protect is the sum of all these parts, both functional and non-functional. The *total* appearance of the Big Top Gumball machine, including not only its individual non-functional features but also the composite image created by *all* features of the machine, makes up its trade dress. *See Sunbeam Prods.*, 123 F.3d at 256 (holding that, for purposes of trade dress protection, "an arbitrary combination of functional features may be non-functional"); 1 McCarthy at § 7:76 ("Almost all courts adhere to this view."). While the Lanham Act does not protect the "invention" of the spiral gumball apparatus from copying, it does protect the apparatus as one part of the total appearance, or the "trade dress", of Big Top Gumball. Its placement in the middle of the machine, attached to a red, centered funnel is certainly *an aspect* of its trade dress. The multitude of other appearances for gumball machines with spiral mechanisms, demonstrated to the Court by O.K. itself, proves that a choice of trade dress different from Big Top Gumball's would not put another at a "significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165, 115 S.Ct. at 1304. Therefore, the Court concludes that "the particular combination of functional features and the way they are arranged and packaged warrant[s] the conclusion that the overall shape and configuration is non-functional." *Sunbeam Prods.*, 123 F.3d at 257 (referring to the trade dress of a kitchen stand mixer) (internal quotations omitted).

### B. *Distinctiveness*

The Lanham Act only protects trade dress that is both non-functional *and* distinctive, a characteristic that may be shown in one of two ways. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58. First, trade dress may be "inherently" distinctive. *Id.* Trademarks and trade dress are deemed inherently distinctive when "their intrinsic nature serves to identify a particular source of a product." *Id.* at 768, 112 S.Ct. at 2757 (finding that the overall motif of a Mexican fast-food restaurant may be protected as inherently distinctive trade dress). Trade dress that "carries no distinctive message of

origin to the consumer" does not meet this standard. *Wiley v. American Greetings Corp.*, 762 F.2d 139, 142 (1st Cir.1985) (deciding that a red heart on a teddy bear was not inherently distinctive). Stated another way, trade dress features are considered inherently distinctive if "their intrinsic nature is such as to 'almost automatically tell a customer that they refer to a brand.'" *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir.1995) (quoting *Qualitex*, 514 U.S. at 162–63, 115 S.Ct. at 1302–03). This type of distinctiveness, as the word suggests, "inheres" in the trade dress itself. *See Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F.Supp. 595, 602 (S.D.N.Y.1996).

Second, trade dress that is not inherently distinctive may still satisfy the first element of a Lanham Act claim if the trade dress has "acquired" distinctiveness. "Acquired distinctiveness" is also referred to as "secondary meaning". *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2758. Trade dress may acquire distinctiveness in a variety of ways, including, for example, consumer association of the trade dress with a source over time. *See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993). "[P]roof of secondary meaning is not required ... where the trade dress at issue is inherently distinctive," *Two Pesos*, 505 U.S. at 776, 112 S.Ct. at 2761, because the distinctiveness element of its Lanham Act claim is already met. Big Top does not argue that the trade dress of the Big Top Gumball Machine has achieved a secondary meaning and chooses instead to stand or fall on the argument that its trade dress is inherently distinctive.

### (1) *Inherent Distinctiveness in Product Configuration Cases*

The 21–year–old test applied generally to determine inherent distinctiveness in a Lanham Act case is familiar to the courts. Though originally developed for trademarks, the Supreme Court in *Two Pesos* endorsed the following categorical inquiry for trade dress as well, because "[t]here is no persuasive reason to apply different analysis to the two." *Two Pesos*, 505 U.S. at 773, 112 S.Ct.

at 2760. Trade dress, "following the classic formulation set out by Judge Friendly, ... may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* at 768, 112 S.Ct. at 2757 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)).

The category into which trade dress or a trademark is placed under the so-called *Abercrombie* classifications determines its distinctiveness for purposes of the Lanham Act. Marks or dress that are suggestive, arbitrary or fanciful, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection" without a further showing. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757. "In contrast, generic marks—those that refer to the genus of which the particular product is a species" are disqualified from protection under the Lanham Act. *Id.* (internal quotations and alteration omitted). Descriptive marks or dress hold down the middle ground. Such marks are not inherently distinctive, but rather can only meet the distinctiveness requirement if they have "acquired 'secondary meaning' by which consumers associate it with a particular product or source." *Boston Beer,* 9 F.3d at 180 (evaluating the distinctiveness of the trademark of a beer) (citing *Two Pesos,* 505 U.S. at 768–69, 112 S.Ct. at 2757–58).[12]

Unfortunately, considerable dissention has developed in the courts over the applicability of *Abercrombie* to cases involving claims of trade dress protection in "product configuration". Two circuits have expressly rejected the categorical *Abercrombie* inquiry in this type of case, and the uncertainty of the law on this point requires discussion.

The Third Circuit was the first to depart from *Abercrombie* when, in 1994, it decided that the "trademark taxonomy, carefully and precisely crafted through a long succession of cases to accommodate the particularities of trademarks, does not fit the quite different considerations applicable to product configurations." *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1441 (3d Cir.

1994) (addressing designs of plastic Grecian urn planters). "Product configuration" refers "to trade dress alleged in the product itself, whether in a specific feature or in some combination or arrangement of features," and the term is designed "to distinguish that type of trade dress from 'product packaging.'" *Id.* at 1439. The Court of Appeals acknowledged that the Supreme Court had expressly extended application of the *Abercrombie* test to trade dress cases, but it decided that the holding of *Two Pesos* was limited to trade dress consisting of product *packaging,* not product *configuration,* because a restaurant's decor was more akin to the former. *See id.* at 1442 (citing *Two Pesos,* 505 U.S. at 767 & 767 n. 6, 112 S.Ct. at 2756 & 2757 n. 6). Having rejected *Abercrombie* in the product configuration context, the Third Circuit drew on the law of unfair competition to develop a new three-pronged test for product configuration cases. For the product configuration of the Big Top Gumball Machine to be inherently distinctive under the *Duraco* test, its trade dress would have to be "(i) unusual and memorable; (ii) conceptually separable from the product; and (iii) likely to serve primarily as a designator of origin of the product." *Id.* at 1449.

The Second Circuit, joining the fray the next year, agreed that the distinctiveness of product configuration should be analyzed differently than the rest of trademark and trade dress law. *See Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1007 (2d Cir.1995) (considering squirrel and leaf artwork designs on a children's sweater not to be inherently distinctive because the designs were primarily aesthetic and "not primarily intended as source identification"). In *Knitwaves,* the court agreed that *Abercrombie* did not apply to product configuration cases because the categorical test "make[s] little sense when applied to product features." *Id.* The Second Circuit, however, rather than adopting the Third Circuit's "wholly-new, multi-pronged test", instead "simply asked whether the design was likely to be understood as an indicator of the product's source." *Landscape*

---

**12.** *Boston Beer* is the only First Circuit case since *Two Pesos* was handed down in 1992 to base its holding on inherent distinctiveness and, therefore, to have occasion to apply the *Abercrombie* categories. The case concerned protection of a trademark, not trade dress.

*Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 378 (2d Cir.1997) (dealing with configuration of outdoor furniture) (citing *Knitwaves*, 71 F.3d at 1008). Additionally, the Second Circuit requires that the design of a product must have been "primarily *intended* as source identification." *Knitwaves*, 71 F.3d at 1009 (emphasis added); *see also Herbko Int'l, Inc. v. Gemmy Indus. Corp.*, 916 F.Supp. 322, 328 (S.D.N.Y.1996) ("determining the producer's intent" to design the product as a source identifier because "it is no longer enough" to demonstrate merely that the trade dress serves to identify the producer). The *Knitwaves* test has been expressly limited to product configuration cases. *See Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000–01 (2d Cir.1997) (considering product packaging of a toy bank).

The Eighth Circuit has led the charge in explicitly rejecting deviations from *Abercrombie* in product configuration cases, and it continues to apply the test to all Lanham Act cases. *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 787–88 (8th Cir.1995) (considering product configuration of personal project planner and notebook); *see also Insty*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 672–73 (8th Cir.1996) (considering trade dress of "quick-change drill chucks and related accessories"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1085, 137 L.Ed.2d 219 (1997). The Eighth Circuit's view is that departures from *Abercrombie* for product configuration plaintiffs would foreclose the possibility that "product configuration, like packaging, can be inherently distinctive," *Stuart Hall*, 51 F.3d at 788, because all plaintiffs seeking Lanham Act protection for product configuration would have to make additional showings. Requiring showings beyond that which is "inherent" essentially blurs the two ways in which trade dress may be distinctive, because such a requirement "applies not to whether a trade dress is *inherently* distinctive, but to whether it has a secondary meaning." *Id.* at 787 (emphasis added). That, according to *Stuart Hall*, would be contrary to the clear holding of *Two Pesos* that a trade dress plaintiff who shows inherent distinctiveness does *not* need to show secondary

meaning. *See id.* at 788; *see also Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58.

Other circuits have mentioned the departures from *Abercrombie* in product configuration cases but have thus far avoided reaching "this controversial question". *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 253 (5th Cir.1997) (avoiding the issue of inherent distinctiveness by finding that the product configuration of a stand mixer had acquired secondary meaning); *see also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658 n. 3 (7th Cir.1995) (summarily agreeing that oval-shaped cable ties were not inherently distinctive and could only merit Lanham Act protection if they acquired secondary meaning).

The First Circuit, for its part, has neither adopted nor rejected the tests in the *Duraco* and *Knitwaves* lines, although it has cited these cases for other propositions. *See Chrysler*, 118 F.3d at 58; *TEC Eng'g*, 82 F.3d at 545; *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1515 (1st Cir.1996); *see also Kasco Corp. v. General Servs., Inc.*, 905 F.Supp. 29, 34 (D.Mass. 1995). Furthermore, the few product configuration cases that have recently come before the First Circuit have been disposed of on grounds other than inherent distinctiveness. *See Chrysler*, 118 F.3d at 58–59 (presuming inherent distinctiveness and disposing of trade dress claim relating to a sports car on grounds of likelihood of confusion); *TEC Eng'g*, 82 F.3d at 545 (remanding case about trade dress of industrial conveyors for explicit findings of fact). The Court is also unaware of a case in this District which relies on the grounds of inherent distinctiveness in deciding a trade dress claim involving product configuration. *Cf. TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 927 F.Supp. 528, 533–34 (D.Mass.1996) (on remand) (deciding based on secondary meaning); *Duracraft Corp. v. Honeywell, Inc.*, 881 F.Supp. 685, 687–88 (D.Mass.1994) (disposing trade dress claim referring to an air cleaner on grounds of functionality and likelihood of confusion).

### (2) *The Test To Be Applied in This Case*

 Faced with "new" tests from neighboring circuits and a dearth of First Circuit

case law on the subject, this Court declines to depart from the *Abercrombie* test for inherent distinctiveness for essentially the reason given by the Eighth Circuit in *Stuart Hall*, that is, that departure from *Abercrombie* is not authorized by *Two Pesos*. See *Stuart Hall*, 51 F.3d at 787–88; *cf. Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1556 n. 39 (S.D.Tex.1996) (deciding to apply *Abercrombie* test to product configuration based on *Two Pesos* and a lack of Fifth Circuit authority to depart from it).

The Supreme Court expressly included "features of product design" as an aspect of trade dress in its discussion of the scope of the Lanham Act. See *Two Pesos*, 505 U.S. at 772; *Chrysler*, 118 F.3d at 58 (including product design in definition of trade dress). Having made the definition of trade dress expansive enough to include product design, the Supreme Court then held that the lower court "was quite right . . . to follow the *Abercrombie* classifications consistently and to inquire whether trade dress for which protection is claimed under § 43(a) is inherently distinctive." *Two Pesos*, 505 U.S. at 773. The Supreme Court never refers to the terms "product packaging" and "product configuration" in *Two Pesos*, throughout which it relied on "a presumption that 'trade dress' is a single concept that encompasses both" subsets. *Stuart Hall*, 51 F.3d at 787–88. This Court therefore agrees with the Eighth Circuit that *Two Pesos* "applies to trade dress as a whole" and that a distinction between product packaging and product configuration "would run contrary to the holding of *Two Pesos*." *Id.*

The Second and Third Circuits justify their new tests with the fair practical concern that the *Abercrombie* test is too difficult to apply to product configurations. See *Duraco*, 40 F.3d at 1440 (not "helpful or proper"); *Knitwaves*, 71 F.3d at 1007 ("make[s] little sense"); *see also* 1 McCarthy § 8.13. Nevertheless, while it may be difficult or nonsensical to apply the test in certain circumstances, the *Abercrombie* categories have been helpful to trial courts in product configuration cases. See, e.g., *Pebble Beach*, 942 F.Supp. at 1558–59 (finding trade dress of one of eighteen golf holes to be inherently distinctive because of

the "arbitrary" placement of a red and white striped lighthouse near the green but finding trade dress of the rest to be merely "descriptive" of a golf hole); *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454, 1464 (D.Kan.1996) (finding trade dress of a jacket to be "descriptive"); *Black & Decker Corp. v. International Sales & Mktg.*, 36 U.S.P.Q.2d (BNA) 1851, 1853 (C.D.Cal. 1995) (referring to the design of plaintiff's "SnakeLight" flashlight as "distinctive and arbitrary"); *Lainer v. Bandwagon, Inc.*, 983 F.Supp. 292, (D.Mass. 1997) (Saris, J.) (finding the product configuration of a portable back scratcher merely to be "descriptive" of the function of the device and therefore not inherently distinctive). In any event, "the Supreme Court has not authorized us to abandon *Abercrombie*, no matter how much difficulty it causes." *Krueger Int'l*, 915 F.Supp. at 602 (citing *Stuart Hall*, 51 F.3d at 788).

Were the *Duraco* or *Knitwaves* test applicable, this Court would have to decide whether the trade dress of Big Top Gumball is best described as product configuration or product packaging. The courts of appeals recognized that this distinction is less than clear even as they segregated product configuration cases from the rest of trade dress law. See *Landscape Forms*, 113 F.3d at 379 (acknowledging that application of the *Knitwaves* test "will also be complicated by the fact that it may at times be difficult to say exactly where a product stops and its packaging begins"); *cf. Duraco*, 40 F.3d at 1442 (distinguishing *Two Pesos* by reasoning that restaurant decor was "more akin" to configuration than packaging). In the Court's opinion, there are elements both of product configuration (*e.g.*, shape, size and layout) and of product packaging (*e.g.*, color and the "greatest show on earth" tag line) in the trade dress of the Big Top Gumball Machine. *Cf. Stuart Hall*, 51 F.3d at 787–88 (noting that the restaurant decor in *Two Pesos* arguably contained both "types" of trade dress). The Court tends to agree that "the entire thrust of *Two Pesos* was to unify the standards for trademark and trade dress, not to balkanize this complex field into yet more subcategories," *Krueger Int'l*, 915 F.Supp. at 602, and

declines to depart from the traditional test for inherent distinctiveness.

### (3) *Applying the Abercrombie Categories*

■ Having decided that the *Abercrombie* taxonomy is the test of inherent distinctiveness applicable to this motion, the Court proceeds to its rather straightforward application at the distinctive end of the spectrum. "An arbitrary mark consists of a word or symbol which is in common usage . . ., but which is arbitrarily applied to the goods. . . ." *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 n. 3 (5th Cir.1984) (quoting 1 McCarthy § 11:2). Said another way, if the trade dress features at issue "serve no function either to describe a product or assist in its effective packaging, there is no reason to require a plaintiff to show consumer connotations associated with such arbitrarily selected features." *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702 (5th Cir. Unit A 1981), *quoted in Stuart Hall*, 51 F.3d at 785; *see also Two Pesos*, 505 U.S. at 773–74 (citing the Fifth Circuit's approach with approval). A feature that serves some function may still be considered part of an "arbitrary" whole in *Abercrombie* analysis. *See Sicilia*, 732 F.2d at 425–26.

■ The trade dress of Big Top Gumball, observed in composite, qualifies as arbitrary. Any one feature of Big Top Gumball, taken in isolation, is a shape or sound in common usage. But the collection of "arbitrarily selected features" that the Ranneys assembled into the trade dress of their machine does nothing to describe the machine's function as an entertainment gumball show or to assist in its packaging. Big Top Gumball's size and shape, particularly its ball and volcano top and wraparound screen, coupled with its circus theme and sounds, when taken together, comprise arbitrary trade dress for a gumball machine. Alternatively, the Court concludes that the overall trade dress of the machine may be described as "fanciful" for essentially the same reasons. Both designations, which result in the legal conclusion that Big Top Gumball is inherently distinctive, merit Big Top a free pass from a required showing of secondary meaning. *See Two Pesos*, 505 U.S. at 776.

### C. *Likelihood of Confusion*

■ Since the Court has determined that Big Top Gumball's non-functional and inherently distinctive trade dress may be protected by the Lanham Act, "the pivotal inquiry becomes whether the allegedly infringing mark is likely to cause consumer confusion." *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546 (1st Cir.1995) (quoting *Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993)); *see also International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996) ("*Winship*"). "If likelihood of confusion is avoided, copying of trade dress can not be prevented under [§ 1125(a)]." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1131 (Fed.Cir.1993). "The trademark statute does not give the [plaintiff] any property right in [its] mark except 'the right to prevent confusion.' " *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 45 (1st Cir.1991) (internal quotations omitted). "To demonstrate likelihood of confusion a markholder . . . must show more than the theoretical possibility of confusion." *Winship*, 103 F.3d at 200.

■ The First Circuit "typically consider[s] eight factors in assessing likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods . . .; (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark." *Id.* at 201. The Court must consider each of the factors in reaching its conclusion. *See Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 3 (1st Cir.1993). "[B]ecause the listed factors must be evaluated in context, any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark." *Winship*, 103 F.3d at 201. The Court considers the eight confusion factors in turn.

### (1) *Similarity of Trade Dress*

When determining similarity, the Court looks at "the total effect of the designation, rather than a comparison of the individual features." *Aktiebolaget*, 999 F.2d at 4 (quoting *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981)); *see also Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989) ("*Sullivan*"). For the purposes of determining similarity, the Court focuses on the versions of Circus World and Gumball Coaster that have actually been offered for sale. *See Swisher Mower & Mach. Co. v. Haban Mfg., Inc.*, 931 F.Supp. 645, 648 (W.D.Mo.1996) (declining to consider a prototype for a product in deciding similarity of marks).

The Circus World machine that ultimately was sold, despite some changes from its January 23 prototype version, remains strikingly similar to Big Top Gumball. It lacks the big red ball atop the machine and lacks animal figurines, but, otherwise, its overall appearance is virtually the same. Undeniably, O.K. made some changes to the inner workings of the machine. However, in a Lanham Act case, the Court is uninterested in functional improvements. The changes in *appearance* to the spiral gumball mechanism are minimal. More importantly, the color, the circus theme, the shape and size and the clear wraparound screen, which are the more prominent features of the trade dress of Big Top Gumball, essentially are replicated. The small manufacturer's plate placed on the base of Circus World does not qualify as a "clearly displayed" designator of origin sufficient to dispel any confusion arising from the apparent similarity of trade dress. *Winship*, 103 F.3d at 204.

The fact that there are some differences between Big Top Gumball and Circus World misses the point: "It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Sullivan*, 867 F.2d at 29–30 (quoting *Baker v. Master Printers Union*, 34 F.Supp. 808, 811 (D.N.J.1940)). This Court is not confused. The functional changes (even improvements) and minor differences in non-functional features do not alter the Court's conclusion that the marks of Big Top Gumball and Circus World are stunningly similar.

Undeniably, Gumball Coaster's trade dress is less similar to that of Big Top Gumball because of its different color and theme. Nevertheless, Gumball Coaster shares many trade dress similarities with Big Top Gumball. The shape and size, clear wraparound screen and general appearance of the spiral gumball mechanism remain unchanged from Circus World. Gumball Coaster is the kissing cousin of Big Top Gumball.

### (2) *Similarity of the Goods*

Big Top Gumball, Circus World and Gumball Coaster are, for the purpose of this confusion factor, "virtually the same goods." *Sullivan*, 867 F.2d at 30. All three products are large gumball machines with multi-gumball entertainment shows that precede gumball delivery.

### (3) *Channels of Trade, Advertising and the Classes of Prospective Purchasers*

The next three factors are typically considered together. *See Winship*, 103 F.3d at 204. The inquiry here is essentially the identity of the relevant market for these gumball machines, and it is likely to be the most hotly disputed issue in this case. "If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.*, a customer or purchaser". *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir.1983) "[T]he Lanham Act is concerned with 'consumer confusion when choosing to purchase, or not purchase, the items, not public confusion at viewing them from afar.'" *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 382 (7th Cir.1996) (restricting the relevant market to twelve companies which were reflected in the record as having purchased goods and/or demonstrated an intention to do so) (quoting *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1229 (7th Cir.1993)).

According to this standard, vendors certainly are within the relevant market. They represent a shared "channel of trade" for the

gumball machines of both Big Top and O.K. Additionally, both companies have advertised in the *Vending Times* and have displayed their wares at trade shows aimed at vendors. Big Top states that the sales of its machines to bulk vendors represent over 90 percent of its business.

O.K. argues that the Court should limit the relevant market to vendors alone. Big Top, on the other hand, suggests that the Court should consider not only vendors but also a much larger class of relevant persons, including (i) non-vendors who purchase gumball machines, (ii) store owners and managers who allow vendors to place machines in their stores, and (iii) those members of the general public who spend a quarter to buy a gumball and watch a gumball show. The Court addresses each of the three additional groups separately.

The first group, non-vendors who actually purchase gumball machines, is not relevant because O.K. has established that it does not market and has not sold Circus World and Gumball Coaster to any customers or purchasers other than vendors. Big Top cites only one instance to the contrary involving Walz Enterprise of Iowa. However, there is no evidence as to the nature of this business other than a conclusory belief that it is not a vending professional. Big Top relies also on the fact that O.K.'s advertising includes a pitch that a "lay person" can understand how to work its machines. In addition, both companies market their machines at trade shows which non-vendors attend. Nonetheless, faced with uncontradicted evidence that all 130 Circus World and Gumball Coaster machines sold as of July 1997 were purchased by vendors, the Court concludes that the manufacturers' channels of trade do not substantially overlap in the market of these non-vendor purchasers.

The second group, retail store owners and managers who allow vendor-owned machines to be placed in their stores, presents a thornier issue. Certainly they are not "customers or purchasers" in the sense that they actually "buy" gumball machines. However, Section 1125(a) of the Lanham Act, which incidentally does not itself contain the words "consumer" or "purchaser", should be "construed broadly, so as to protect the remedial nature of the Act." *Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc.*, 931 F.Supp. 377, 384 (E.D.Pa. 1996) (citing *American Tel. and Tel. Co. v. Winback and Conserve Prog., Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)). The market for vending machines differs from that for consumer products, which are typically "purchased" by the end user at the termination of the stream of commerce. Some store owners (for example, Wal–Mart) substantially influence the buying decisions of vendors. They exercise discretion in deciding which gumball machines appear in their stores and typically collect a percentage of the proceeds from the gumball machines that appear in their stores. Store owners attend trade shows directed at supermarkets and other retail stores at which Big Top Gumball, and perhaps O.K.'s products, are displayed. They do in fact contribute an asset, that is, space in their stores, without which gumball machines owned by vendors would be useless.

Based on these facts, Big Top argues that these store owners as "customers or purchasers" for Lanham Act purposes in the unique vending machine market. Plaintiff's argument rests on the doctrine of post-sale confusion. Many courts have held that the Lanham Act protects post-sale, as well as point-of-sale confusion. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989 (Fed.Cir.1993) (noting "the widespread recognition by so many other circuits of the importance of post-sale confusion"); *see also Chrysler*, 118 F.3d at 59. Post-sale confusion refers to the association consumers might make between the allegedly infringing item and the familiar product, thereby influencing their purchasing decisions. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir.1986); *see also Insty*Bit*, 95 F.3d at 672 (trade dress infringement); *Keds*, 888 F.2d at 222 (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir.1980)); *Dorr–Oliver*, 94 F.3d at 381. The flaw in plaintiff's argument is that none of these cases discuss post-sale confusion by non-purchasers who influence the buying decisions of purchasers where the purchasers are not

themselves confused as to the source or origin of a product. However, in light of the broad remedial nature of the Lanham Act, there is a strong argument that in some circumstances, a non-purchaser with substantial influence over the buying decision of a purchaser could potentially be deemed a consumer for purposes of a likelihood of consumer confusion analysis.

■ Though the Court would be willing to consider such an expansion, two stumbling blocks obviate the need to decide this point and eliminate not only store owners but also the third group, the kid-in-the-store gumball purchasers, from consideration. First, although Big Top has produced twenty-five instances of confusion about the source of the Circus World machine, the record is bare as to who these callers are. Second, even assuming these are retailers with influence over purchasing decisions of vendors, Ranney Sr. states, "All the store owners know is that they are excited to place my multi-kinetic, multi-gumball machine in their store vestibules." Big Top's counsel freely admits that both groups "neither know nor care who manufactures the Plaintiff's invention. All they know is that they want the Plaintiff's unique and exciting multi-kinetic, multi-gumball invention, regardless of where it comes from." This concession, which is uncontradicted by any evidence in the record, precludes consideration of the store owners. In order to be included in the Court's confusion analysis, a class of "consumers" must "care that the product comes from a particular producer (though they need not be able to identify him) and must desire the product with the particular feature *because it signifies that producer.*" *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 658–59 (7th Cir.1995) (emphasis added).

Big Top argues vehemently that it spent $750,000 (which is undocumented) at 35 trade shows to create excitement about its machine. There is a critical distinction, however, between a desire among the store owners to have a multi-gumball entertainment machine made by Big Top "above all other" manufacturers and a desire to have that type of machine "regardless of who made them." *Id.* at 659 (quoting *Sinko v. Snow–Craggs*

*Corp.,* 105 F.2d 450, 453 (7th Cir.1939)). The Court concludes that the desire of the store owners fits into the latter category, and thus Big Top does not have a "right to monopolize even though [it] might have been the first to make the article in the particularly desirable manner." *Thomas & Betts,* 65 F.3d at 659.

■ Having decided that vendors are the only ones whose confusion as to product source will be considered, at least in determining this preliminary motion, the Court also must "ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark." *Winship,* 103 F.3d at 204; *compare Astra,* 718 F.2d at 1206 (considering sophisticated hospital personnel to be the relevant market for a computerized blood analyzer machine at issue) *with Sullivan,* 867 F.2d at 30 (considering the less-sophisticated "public at large" to be the market for the t-shirts at issue in the case). Courts have found less likelihood of confusion where goods are expensive and purchased after careful consideration. *Sullivan,* 867 F.2d at 30 (quoting *Pignons,* 657 F.2d at 489). The Court concludes that vendors are particularly sophisticated purchasers of the expensive gumball machines at issue in this case.

*(4) Evidence of Actual Confusion*

There is no evidence that vendors are confused about the sources of Big Top Gumball, Circus World or Gumball Coaster. Kurt Ostler states that there has not been a single instance of consumer confusion among its bulk vending customers. Big Top presented only two pieces of evidence suggesting actual confusion. First is the comment by Roger Folz at the January 23 meeting that the Circus World Prototype and Big Top Gumball, both displayed at the meeting, were "the same machine". However, as Folz made the comment, he knew that Circus World was a product of O.K. Second are the just-described 25 calls to Big Top's headquarters asking about the Circus World machine. While this presents evidence of marketplace confusion as to source or origin, the weight of this evidence is diminished because the Court has no way of knowing who in fact made these calls. In contrast, O.K. offered con-

vincing evidence from several vendors who swore they were not in the least confused about the sources of the various machines. "[W]eak evidence of actual confusion weighs quite heavily against a finding of likelihood of confusion." *Aktiebolaget*, 999 F.2d at 4.

Big Top persists by arguing that this is a case of "initial interest" confusion, in which vendors purchased Circus World and Gumball Coaster after seeing the Circus World Prototype at the January 23 meeting. This argument also fails. True, the Lanham Act "forbids a competitor from luring potential customers from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Dorr–Oliver*, 94 F.3d at 382. However, O.K. did not attempt to pass off the Circus World Prototype as a Big Top product—quite the contrary.[13] Also, the dramatic (possibly fraudulent) presentation of the Circus World Prototype occurred in the same room as Big Top Gumball in a meeting with other competing manufacturers before an audience of potential buyers. If a second comer markets its product as an alternative to the first comer's product, the first comer cannot establish "initial interest" confusion. *See id.* at 383.

It is worth highlighting that Big Top has presented strong evidence of actual confusion on the part of a store "representative" whose job it is to permit vendors to place their machines in his store. Ranney Sr. testified that a Star Market representative actually thought that Big Top machines were being installed in his stores by Folz Vending when in fact Folz was installing machines made by O.K. It appears that this unnamed "representative" first saw Big Top Gumball at a trade show targeted at managers of supermarkets and retail stores. Enthralled, he wanted one in every store, but Ranney Sr. was too backlogged to deliver. Ranney Sr.

believed he had an oral, "tentative" agreement to put the machine in 42 Star Market stores. When he called over a year later to start placing machines, the representative had already made a deal with Folz. The representative said he thought it was "the same machine". However, Folz Vending was not confused, and there is no evidence that Star Market asked Folz Vending to purchase a Big Top machine. Regardless, this evidence of confusion is irrelevant to this motion because, as explained above, a "relevant person" cares not only about the type of product but also about the source of that product. Big Top has presented insufficient evidence to demonstrate a likelihood of success on the claim that these confused "representatives" wanted Big Top to be the source.

(5) *Defendants' Intent in Adopting Their Marks*

 If a defendant has intentionally copied the trade dress of the plaintiff's product, the plaintiff is entitled to a rebuttable presumption of likelihood of confusion. *See Sullivan*, 867 F.2d at 34. "[W]hen there is intentional copying of a product's trade dress, 'the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.'" *Id.* at 34–35 (*quoting Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980)). The presumption "works with maximum efficiency in the commercial setting." *Winship*, 103 F.3d at 206 n. 10 (citing *Sullivan*, 867 F.2d at 34).

O.K. intentionally copied the trade dress of Big Top Gumball. O.K.'s president, Jeff Ostler, boldly admitted his intention to "produce a like-type machine" in his November 7, 1996 letter to David Graham at Wal–Mart. Its presentation at the January 23, 1997 meeting—where one third of the bulk vending industry was present—of a near-replica of

---

13. Big Top cites at least one case standing for the proposition that a Lanham Act claim lies also for "reverse palming off", i.e., repackaging another's product and passing it off as one's own. *See Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1438 (9th Cir.1993). However, Big Top does not press its claim in this form, which may or may not be actionable in the First Circuit. *See Kasco Corp. v. General Svcs.,*

*Inc.*, 905 F.Supp. 29, 35 (D.Mass.1995). In any event, there is a genuine dispute of fact in the preliminary record as to whether the Circus World Prototype was actually a Big Top Gumball machine. This conduct, if true, could also form the basis for a claim of wrongful interference with advantageous relationships and a violation of Mass.G.L. c. 93A.

Big Top Gumball, circus-theme and all, belies its claim that it intended merely to demonstrate to vendors its ability to compete in the emerging market for combined gumball-entertainment machines.[14] The presentation to the Court of seven other gumball machines in the business, courtesy of Kurt Ostler, is actually stunning proof of O.K.'s intent to copy in that the other machines look absolutely nothing like the Circus World Prototype and Big Top Gumball, which look identical. Worse, its possession of a Big Top Gumball machine and actual use of several, perhaps as many as 22, parts of the machine in its prototype that was presented at the meeting demonstrates to the Court a clear intent to copy the trade dress of Big Top Gumball.

Although a presumption of likelihood of confusion follows from intentional copying, it must be remembered that intentional copying is not actionable under the Lanham Act "absent evidence that the copying was done with the intent to derive a benefit from the reputation of another." *Esercizio v. Roberts,* 944 F.2d 1235, 1243 (6th Cir.1991) (quoting *Zin–Plas. Corp. v. Plumbing Quality AGF Co.,* 622 F.Supp. 415, 420 (W.D.Mich.1985)). Whether the defendant acted in bad faith in adopting the trademark or trade dress to "pass off" its goods as those of the owner is a critical consideration. *See Aktiebolaget,* 999 F.2d at 3; *cf. Insty*Bit,* 95 F.3d at 667. "Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out." *West Point Mfg. Co. v. Detroit Stamping Co.,* 222 F.2d 581, 586 (6th Cir. 1955). If all that O.K. has done is to attempt to copy a "competitor's design because it sells better and consumers seem to like it, then this is not evidence of an intent to confuse." 1 McCarthy at § 8.19.

This is a highly unusual case because the evidence suggests no intent by O.K. to palm off Big Top's reputation in the gumball machine marketplace—which was minimal—or to confuse any vendors as to the source of the goods. The evidence at this stage of litigation appears to support the conclusion that O.K. noticed that Big Top's new multi-gumball machine was achieving attention "and decided to climb on the bandwagon." *Libman Co. v. Vining Indus.,* 69 F.3d 1360, 1363 (7th Cir.1995). "We call that competition, not bad faith, provided there is no intention to confuse, and, so far as appears, there is none." *Id.* O.K.'s unabashed intention to knock off is *not* tantamount to an unabashed intention to palm off. Therefore, though Big Top is entitled to a presumption of confusion due to O.K.'s intent to copy, the particular facts of this case weaken that presumption.

### (6) Strength of the Trade Dress

Big Top's trade dress is not particularly strong. The First Circuit examines three factors in assessing trademark or trade dress strength: "'the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action in promoting the mark.'" *Equine Techs.,* 68 F.3d at 547 (quoting *Keds Corp.,* 888 F.2d at 222). Big Top Gumball is a relative newcomer to the gumball machine marketplace, and it has not distributed its machine widely enough to achieve renown in its field. *See Keds,* 888 F.2d at 222 (referring to a mark used for over 60 years); *Sullivan,* 867 F.2d at 32 (relying on fact that defendant had used its marks "for a long period of time"). Big Top has changed frequently Big Top Gumball's decoration and ornamentation, two important elements of the overall trade dress of the product. Though Big Top has worked to promote its distinctive product for some period of time, the promotion is not enough to propel the product's trade dress into the ranks of those with "strong" trade dress for Lanham Act purposes.

### (7) Weighing the Confusion Factors

Having carefully applied these eight factors to the record in this case, the Court concludes that Big Top has failed to demon-

---

**14.** Though the Court did not consider the January 23 Circus World Prototype in deciding the confusion factor of similarity of trade dress, it considers it here as highly probative to the intent of O.K. in producing a competing gumball machine.

strate a likelihood of confusion. On Big Top's side of the ledger is the following evidence: (1) O.K.'s intent to copy Big Top's trade dress, at least prior to the January 23, 1997 vendor meeting; (2) the similarity of the fanciful trade dress; (3) the similarity of the product; and (4) the similarity of the channels of trade, with both sides marketing their gumball machine primarily to vendors. On O.K.'s side of the ledger are the following factors: (1) the high level of sophistication of the vendors; (2) compelling evidence that the vendors were never confused and fully understood that O.K. manufactured Circus World and Gumball Coaster; (3) little possibility that consumers are likely to be confused based on the large differential in price between the machines; (4) the relative weakness of the Big Top trade dress given Big Top's new appearance in the gumball market; and (5) the lack of evidence that Big Top had established goodwill in the marketplace. This Court concludes that O.K. has rebutted the presumption of confusion against it by demonstrating to the Court that confusion by purchasers in the relevant bulk vendor market has not occurred and is not likely to occur in the future.

The Lanham Act provides protection from those who copy non-functional distinctive trade dress, but it does so only where there is a likelihood of confusion as to source in a relevant market. On this record, the Court cannot conclude that Big Top has established a substantial likelihood of success on the merits of its Lanham Act claim against O.K. or, consequently, the other defendants. Therefore, without needing to consider the other elements of the preliminary injunction standard, the Court refuses to use the Lanham Act as a basis for injunctive relief.

### 2. STATE CLAIMS

Big Top also moves for a preliminary injunction on the basis of the several state claims it asserts in its complaint. Specifically, Big Top contends that injunctive relief is warranted because the defendants variously engaged in a conspiracy to commit fraud, a breach of contract, a breach of good faith and fair dealing and a violation of Mass. G.L. c. 93A. In considering the motion on these collective grounds, the Court is bound by the following standard, which is essentially the same as the standard governing a preliminary injunction under the Lanham Act:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, *i.e.*, the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect. (if any) of the court's ruling on the public interest.

*Strahan v. Coxe,* 127 F.3d 155, 160 (1st Cir. 1997). Unlike in the Lanham Act claim, where other rulings flow from the Court's decision on the likelihood of success on the merits, here the Court engages in a more general balancing of the four factors in its discretion. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir.1996).

The Court will not allow a preliminary injunction on any of the asserted state grounds because Big Top has not produced evidence sufficient to satisfactorily demonstrate irreparable harm. Big Top claims that it may quickly go out of business if the injunction is not issued. The only admissible evidence the Court has of this claim is an estimate by Ranney Sr. that Big Top sales have declined 75% since January 1997 (a figure without any other basis in the evidence). More critically, the Court is not convinced that the issuance of the injunction will have any effect on the state of Big Top's affairs because, though Big Top has shown that it *lost* business because of O.K. (principally, if not exclusively, to Folz Vending), Big Top has not shown that it will automatically gain that business back if the injunction issues or that any increase in business will offset Big Top's financial woes. The evidence is that those who purchased O.K.'s machine did so because they were able to get a similar machine at half the price. Finally, all of Big Top's alleged injuries can be compensated by an adequate remedy at law in the upcoming trial. In other words, Big Top has not demonstrated to the Court that its allowing the extraordinary remedy of prelim-

inary injunctive relief will have any real ameliorative effect on any harm which may already have been done to Big Top's business.

Although the Court need not decide the likelihood of success on the merits on the state claims against the various defendants, several comments on the merits are in order as this case moves to trial. The factual record, voluminous though it is for a case only at the preliminary injunction stage, is riddled with factual disputes that go to the heart of all of the state claims. Among others, there are fact disputes concerning (1) the adequacy of the performance of the Big Top gumball machine; (2) the reason why Big Top Gumball appears in a published Sam's Club brochure but Sam's Club refused to sell it; (3) whether there was an agreement between Wal–Mart and/or Sam's Club and Big Top; (4) the relationship between Wal–Mart, O.K. and Selectivend; and (5) whether the machine which O.K. presented as its own at the January 23, 1997 meeting of the vendors in Arkansas was really Big Top's machine in a different cabinet. These fact disputes hinge on credibility determinations which the Court cannot make at this preliminary stage.

### ORDER

Big Top's motion for a preliminary injunction (Docket No. 26) is **DENIED**.

**Coaster™ Serie**

**CABINET**
·32"W x 21.5" D x 85" H
·Power 110V (Foreign Available)

**PRODUCT**
·Gumballs — 850 ct (Holds 3100)
·Gumball — 1050 ct (Holds 6160)
·Jawbreakers — 1085 ct (Holds 6180)

**FEATURES**
·20 Second Show
·Changeable Music & Graphics
·Can be Multi-Vend

**O.K. MANUFACTURING** 1-800-748-5480
1-801-974-9116
2840 South 900 West • Salt Lake City, Utah 84119 FAX 1-801-974-5458