**CONTINENTAL PLASTIC CONTAINERS, Plaintiff–Appellant,**

v.

**OWENS BROCKWAY PLASTIC PRODUCTS, INC., Defendants–Appellees.**

No. 96–1509.

United States Court of Appeals, Federal Circuit.

March 31, 1998.

Rehearing Denied; Suggestion for Rehearing In Banc Declined May 27, 1998.

Edwin C. Thomas, III, Bell, Boyd & Lloyd, Chicago, IL, argued, for plaintiff-appellant. With him on the brief were David M. Novak and Rebecca C. Meriwether.

Douglas A. Freedman, Latham & Watkins, Chicago, IL, argued, for defendants-appellees. With him on the brief were David A. Nelson and Kenneth G. Schuler.

Before MAYER, Chief Judge,* and RICH and NEWMAN, Circuit Judges.

Opinion of the court filed by Circuit Judge RICH. Concurring-in-part and dissenting-in-part opinion filed by Circuit Judge PAULINE NEWMAN.

RICH, Circuit Judge.

Continental Plastic Containers, Inc. (Continental) appeals from the judgment of the United States District Court for the Northern District of Illinois, 95–CV–4670, granting a motion for summary judgment in favor of Owens–Brockway Plastic Products, Inc. (Owens) (1) holding that U.S. Design Patent No. Des. 352,905 is invalid because Continental's product embodying the patented design was "on-sale" within the meaning of 35 U.S.C. § 102(b), and (2) holding that, given the relevant market, Owen's trade dress did not create a likelihood of confusion as to source under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994). We affirm.

## BACKGROUND

Continental and Owens are both in the business of wholesaling, inter alia, gallon sized containers suitable for juice. Continental is the assignee of record of U.S. Patent No. Des. 352,905 (the '905 patent) (issued Nov. 29, 1994), the application for which was filed on 16 February 1993. The '905 patent claims: "The ornamental design for an exterior surface of a side wall for a juice contain-

* Chief Judge Mayer assumed the position of Chief Judge on December 25, 1997.

er, as shown and described." Figure 1 is exemplary of the design:

*Fig. 1*

On 14 August 1995, Continental took steps to enforce the '905 patent against Owens, suing it for design patent infringement and trade dress infringement, under both state law and the Lanham Act. After completing a modicum of discovery, Owens raised the affirmative defense of patent invalidity under 35 U.S.C. § 102(b), alleging that Continental sold or offered for sale containers embodying the design of the '905 patent more than one year before its filing date. On 10 October 1995, Owens filed a motion for summary judgment on both the patent and trade dress claims.

The district court granted summary judgment in favor of Owens, holding (1) that the patent was invalid under 35 U.S.C. § 102(b) because of an "on-sale" bar, and (2) that Owens' trade dress did not create a likelihood of confusion as to source in the relevant market so as to support an action under the Lanham Act. Continental appeals both the patent and the Lanham Act rulings. Owens alleges that Continental's appeal is frivolous and requests damages and costs under Rule 38 of the Federal Rules of Appellate Procedure.

## DISCUSSION

### I

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). We undertake plenary review of a grant of summary judgment. *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1449, 27 USPQ2d 1297, 1301 (Fed. Cir.1993).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. In ruling on a motion for summary judgment we consider

the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. at 2513. We must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof.

## II

A claimed design is considered to be "on-sale," within the meaning of section 102(b), when an embodiment of the design was sold or offered for sale in this country more than one year before a filing date to which the claim is entitled (the critical date) and the sale or offer to sell was primarily for profit rather than for experimental purposes. *See King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 859–60, 226 USPQ 402, 406 (Fed.Cir.1985). Integral to our analysis are "[a]ll of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, [which] must be considered and weighed against the policies underlying section 102(b)." *UMC Elec. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1471–72 (Fed.Cir.1987).

We have enumerated the policies governing the totality of the circumstances as follows: (1) discouraging the removal from the public domain of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time of one year. *King Instrument Corp.,* 767 F.2d at 860, 226 USPQ at 406.

The district court held on summary judgment that the '905 patent was invalid as being "on-sale" within the meaning of 35 U.S.C. § 102(b), by virtue of the fact that Continental had offered the patented design to customers and agreed to supply L & A Juice, Inc. (L & A Juice) with gallon bottles embodying the patented design prior to the critical date of 16 February 1992.

The following facts pertinent to the alleged sale are either undisputed or represent Continental's version. Continental entered into a supply agreement with L & A Juice on 3 January 1992 (the supply agreement). The supply agreement provided that Continental was to supply L & A Juice with all of its inventory requirements for polypropylene lamicon 155 gram 128 oz. bottles, effective 1 April 1992. As a result of a series of delays, Continental did not begin providing L & A Juice with the bottles until the fall of 1992. On appeal Continental argues that it was not until well after the critical date that it was able to manufacture the patented design and hence the supply agreement did not represent the sale of an embodiment of the patented design.

The supply agreement represented the culmination of a series of events which began in late 1990 when Continental began wooing Tree Top as a potential customer. Tree Top had expressed an interest in a 128 oz. bottle made of polypropylene lamicon, suitable for apple juice. As is customary in the industry, Continental solicited Tree Top's interest based on relatively crude line drawings or silhouettes.

When it had piqued Tree Top's interest, Continental created a blueprint three-dimensional article drawing and subsequently a solid wood model. It forwarded the wood model to Tree Top in April 1991. A solid wood or epoxy model is customarily produced after the customer expresses interest, with the expectation that changes might be necessary to cement customer approval. Continental continued to negotiate with Tree Top throughout 1991, until Tree Top shelved the project in the late fall of that year.

It was at this juncture that Continental and L & A Juice began their relationship. Because Continental had already produced the drawings and the model in conjunction with the Tree Top negotiations, Continental was able to solicit L & A's interest in design of the gallon bottles using the wooden model and some three-dimensional article drawings which were based on the model. The series of drawings begin with the three-dimensional

article drawing designated HM–2189–1 and dated 18 October 1991, and end with the article drawing designated HM–2189–7 and dated 19 August 1992.

Continental's commitment to the project was demonstrated on 11 December 1991, when a "critical female duplicating model" was produced. This model can be used to create unit or production molds. The production molds are a capital intensive endeavor and, as such, are generally the subject of thoughtful consideration. Continental ordered a prototype production mold on 3 January 1992—the same day that the supply agreement was executed. Subsequently, on 10 February 1992, a proto-mold was shipped to Continental. Thus, prior to the critical date of 16 February 1992, a wooden model and the first three of the three-dimensional article drawings were complete and the production molds were ordered and shipped.[1]

### A.

■ Continental argues that these molds and article drawings did not embody the patented design because significant changes were made to the design as a result of its inability to mass produce a gallon bottle represented by the early drawings, specifically changes to the rocker bottom and surface handle eye, height, vertical load, cavity area, wall thickness, lip width and label size/contour. The district court acknowledged that the design was revised seven times to accommodate the manufacturing difficulties.[2] However, as Owens points out and the court

found, the changes to the drawings in the HM–2189 series were so minute that Continental's product designer, Manderfield, had to use a measuring instrument to distinguish between the article drawings in the series. Since the designer himself could not distinguish between the designs without a measuring instrument, we must conclude that there were insufficient differences to rise to the level of a practical ornamental difference from the pre-critical date drawings and, hence, the molds and article drawings did embody the patented design.

### B.

■ Continental argues that the '905 patent is not subject to the "on-sale" bar because, as manufacturer, it was unable to produce a functionally operable article embodying the design prior to the critical date. Continental asks us to extend *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321 (Fed.Cir.1994), to hold that any adjustments to functional features of the article of manufacture suspends the application of a section 102(b) bar for the purpose of claiming the ornamental design.

In *Tone Bros.* this court held that "public use" under section 102(b) could be negated by experimentation directed at optimizing the functional aspects of an article while not addressing the ornamental aspects of its design. *Tone Bros.*, 28 F.3d at 1199–1200, 31 USPQ2d at 1325–26. *Tone Bros.* is a "public use" case. We see no reason to extend the

---

1. The production mold is produced based on specifications agreed upon after the customer has reviewed the wooden or epoxy model. Often times, Continental reports, the mold is altered to accommodate the customer's mass production requirements. Continental emphasizes that in its industry it is the customer who ultimately approves the shape of the container because it is the customer who best knows the appeal of a particular shape in the market. Further, it is the customer who sets the specifications for and performs the definitive tests on the container because it is the customer who knows what its buyers want and has the filling lines on which the container must run.

2. These changes are as follows:
   1. Article Drawing H–2189–2, dated January 20, 1992, reflects changes in the relative height and the addition of a label panel contour;

2. Article Drawing H–2189–3, dated January 28, 1992, reflects another height adjustment, a different base length, and alterations of the label area and size;
   3. Article Drawing H–2189–4, dated February 22, 1992, reflects changes to the area of finish or the section of the container receiving the cap;
   4. Article Drawing H–2189–5, dated February 24, 1992, reflects a fourth height adjustment;
   5. Article Drawing H–2189–6, dated March 25, 1992, reflects a fifth height adjustment;
   6. Article Drawing H–2189–7, dated April 24, 1992, reflects changes in the shape of the handle area (increased handle opening) and a reduction of the size of the label area; and
   7. Article Drawing H–2189–8, dated August 19, 1992, reflects a new label contour and a new relative height.

analysis to the "on-sale" context. "Public use" and "on-sale" bars, while they share the same statutory basis, are grounded on different policy emphases. The primary policy underlying the "public use" case is that of detrimental public reliance, whereas the primary policy underlying an "on-sale" case is that of prohibiting the commercial exploitation of the design beyond the statutorily prescribed time period. Thus, in *Tone Bros.* the court merely distinguished between the display of a design to generate public interest versus the display of a design for experimental use. It concluded that the display was not contrary to the policy of detrimental public reliance because the display was for the sole purpose of experimentation. In contrast, Continental's agreement with L & A Juice to sell the patented design is an explicit commercial exploitation of the claimed design outside of the generous one year grace period.

We further note that Continental's premise that the "on-sale" bar should not apply because the ornamental design for an article of manufacture is merely a conception until the underlying article is functionally operable is fundamentally flawed for several policy reasons. First, the specific functions of the article of manufacture are not necessarily disclosed in the design patent. There is, for example, nothing in the '905 patent · which indicates that the article of manufacture should not rock or should be suitable for mass production. If we were to adopt Continental's interpretation, not only would district courts likely be deluged with hindsight analysis as to what features were required to produce a functional article, but it would virtually require parties to seek judicial determinations in order to establish that which should be readily apparent from the face of. the design patent.

■ Second, Continental's interpretation improperly imbues the patented design with additional limitations taken from a commercial embodiment. *See Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 43 USPQ2d 1953 (Fed.Cir.1997). There is nothing in the '905 patent which restricts size, volume, weight, wall thickness, manufacturing materials or labels. The claim is solely

directed to the ornamental or appearance aspects of the article of manufacture as depicted in the patent drawings. *See* 35 U.S.C. § 171 (1994). We conclude that it was irrelevant to triggering the "on-sale" bar that Continental had not yet manufactured a "functionally acceptable container." There is no functionality requirement in obtaining a design patent. *See* 35 U.S.C. § 171 (1994).

### C.

■ Continental argues that the "on-sale" status of its patented design before the critical date is negated by experimental use. Experimental use negation applies, in utility patent cases, if there is genuine experimentation directed to perfecting the features of the claimed invention. *See Western Marine Elec., Inc. v. Furuno Elec. Co.,* 764 F.2d 840, 226 USPQ 334 (Fed.Cir.1985). The policy behind experimental use negation is to give the inventor an opportunity to reduce the invention to practice. *TP Lab., Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 220 USPQ 577 (Fed.Cir.1984). Thus, experimental use can not occur after a reduction to practice. *See Atlantic Thermoplastics Co. v. Faytex Corp.,* 5 F.3d 1477, 1480, 28 USPQ2d 1343, 1346 (Fed.Cir.1993). Since design inventions are reduced to practice as soon as an embodiment is constructed, *Fitzgerald v. Arbib,* 46 C.C.P.A. 969, 268 F.2d 763, 122 USPQ 530, 532 (1959) ("[T]his court and its predecessors in patent jurisdiction have held that reduction to practice of a three-dimensional design invention requires the production of an article embodying that design."), experimental use negation is virtually inapplicable in the design patent context. Applying experimental use negation in the design patent context would allow entities to increase the life of their design patents merely by tarrying over the production of the article of manufacture.

■ Continental contends that regardless of whether the design was reduced to practice, Continental was merely perfecting the functional aspects of its design and thus, under *Tone Bros.* the sale should be subject to experimental negation. Even if we extend *Tone Bros.*, a "public use" case, to the "on-sale" context, there is no nexus between the

alleged experimentation and the sale in this case. Continental did not sell the bottles to L & A Juice for any purpose other than commercial exploitation. The fact that it had to make minor modifications to the article is entirely unrelated to the sale. This is not a case in which Continental sold a discrete number of the bottles to L & A Juice so that L & A Juice might experiment on them to ascertain whether they were suitable for a particular purpose. In fact, under the terms of its supply agreement with L & A Juice, Continental was to provide as many bottles of the patented design as L & A Juice required for its retail sales. This is a clear commercial exploitation unaccompanied by any of the indicia of experimentation.

Accordingly, we affirm the court's ruling on summary judgment that the '905 patent is invalid under the "on-sale" bar.

### III

██ Section 43(a) of the Lanham Act creates a federal cause of action for trade dress infringement. Section 43(a), 15 U.S.C. § 1125(a), read, at the time of this action, in pertinent part:

> False designation of origin and false descriptions forbidden
>
> (a) Civil Action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...
>
> ...
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

In reviewing Lanham Act claims we look to the law of the regional circuit where the district court sits, here the Seventh Circuit. *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 987–88, 27 USPQ2d 1516, 1518 (Fed.Cir.1993).

In order to prevail, Continental must show that its trade dress is either inherently distinctive or has acquired a secondary meaning, and that the similarity between Owen's trade dress and its own would cause a likelihood of confusion as to the source of the product. *See, e.g., Computer Care v. Service Sys. Enter., Inc.*, 982 F.2d 1063, 1067–68 (7th Cir.1992). For the purposes of summary judgment, Owens conceded secondary meaning. Thus, the district court addressed only the issue of likelihood of confusion as to source. It found that there was no trade dress infringement because Continental had failed to establish a likelihood of confusion in the relevant consumer base.

██ On appeal, Continental argues that the district court erred because it did not properly identify the relevant consumer base in applying the test for likelihood of confusion and, as a result, failed to recognize the evidence of confusion adduced by Continental. We disagree. The district court found that the relevant consumer base was wholesale purchasers of empty bottles without lids or labels. As the district court noted, the wholesale purchasers may be characterized as sophisticated buyers because, by Continental's own description of the custom in the industry, sales to these parties are likely to be the culmination of long-term negotiations, direct communication between the parties, and ongoing contact, for example, to make design adjustments such that the bottle will be suitable for the customer's particular mass production needs. These purchasers are very unlikely to be confused over the source of the bottles.

Continental argues that the relevant market includes the ultimate retail consumer, i.e., the person purchasing bottled juice in the grocery store. It argues that the evidence is that the container, as well as the contents of the container, sells the ultimate product to the consumer. If a consumer has a bad experience with the product because of

Owen's faulty design, this directly impacts Continental's sales. Thus, it was the ultimate consumer market that Continental surveyed for confusion.

The district court properly rejected this data on the basis that these consumers are buying juice, not plastic bottles. As Owens points out, the Seventh Circuit has indicated that in determining whether there exists a likelihood of source confusion, "the proper inquiry centers on the *confusion of consumers in the market for the particular product at issue.*" *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 382, 39 USPQ2d 1990, 1995 (7th Cir.1996) ("The proper examination is not whether some people viewing [the products] might be confused, but rather whether consumers in the market for [the products] are likely to be confused."). Thus, Continental is faced with an insurmountable hurdle. The wholesalers to whom it markets its bottles are not in the bottle business, they are in the juice business. While the shape of the bottle may create confusion as to the source of the juice, this is irrelevant to the determination as to confusion as to the source of the bottles. Common sense and Seventh Circuit law dictate that there must be a clear nexus between the relevant product and confusion of the potential customer of that product.

■ Lastly, Continental asserts that the district court erred in failing to apply the Seventh Circuit's "seven factor test" for likelihood of confusion. It argues that application of the test reveals Owens to be in violation of the Lanham Act. We disagree. First, the district court was not required to apply the seven factor test. *See Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1364, 36 USPQ2d 1751, 1754 (7th Cir.1995); *Dorr–Oliver,* 94 F.3d at 381, 39 USPQ2d at 1994. The seven factor test simply provides the district court with a *general framework for analysis.* There are occasions, such as this, where that framework is not required. Second, in light of our determinations of the relevant consumer market, we see no need to address Continental's flawed application of the seven factor test to its facts.

Accordingly, we affirm the court's ruling on summary judgment that there was no likelihood of confusion as to source in the relevant market to support a finding of trade dress infringement.

### IV

Owens raises a claim for damages under Fed. R.App. P. 38 for frivolous appeal both in its brief and through a separate motion. We deny the motion without comment.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, concurring-in-part and dissenting-in-part.

I concur in the decision with respect to the trade dress issues. I must, however, dissent from the court's creation of a new rule specific to design patents, the panel majority holding that experimental use is "virtually inapplicable in the design patent context."

In determining whether and when an on-sale bar, 35 U.S.C. § 102(b), starts to accrue, the "totality of the circumstances" must be considered. While the panel majority gives nodding recognition to this standard, my colleagues hold that it does not apply to design patents. Why not? I can think of no public policy that is served by removing design patents from the body of precedent that guides application of § 102(b). Indeed, the statute itself requires otherwise. *See* 35 U.S.C. § 171 ("The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.") There is no reason, in law or policy, for the panel majority's new and special rule whereby the statutory bar accrues for design patents as soon as the basic design of the article is made, even when later modifications of the design are essential to the utility of the article for its intended use. A patentable design is a design for an article of manufacture; *see* 35 U.S.C. § 171; *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123, 25 USPQ2d 1913, 1917 (Fed.Cir. 1993) ("A design patent is directed to the appearance of an article of manufacture. An article of manufacture necessarily serves a utilitarian purpose....").

Thus the bar to patenting should not accrue until the design of the article is successfully completed. The design of an article of

manufacture is not complete until the design is useful, that is, until the article as designed has been shown to be capable of its intended use. In the course of achieving this result intervening design changes, whether viewed as experimentation or simply as steps toward the final design, are not statutory bar events.

In the case before us, the design concept for a plastic juice bottle was created for a potential customer who liked it and agreed to buy it, and a prototype mold for manufacture was made, six days before the critical date. However, the design failed. The prototype mold could not make the product, because of flaws in the design. Design changes were required and were made, followed by new prototype molds. The district court listed seven changes in the design. Five of these changes were made after the critical date, including changes to relative height, handle configuration, and label area. Some of the changes were essential to successful manufacture of the article, and others flowed from the essential changes. Although the changes were apparently minor from the viewpoint of overall appearance, they were critical to the manufacture of the bottle bearing the design. It can not be the correct law to hold that the on-sale bar accrued when the article as initially designed, before the critical date, was known to be incapable of manufacture. The designer can not be charged with accrual of the statutory bar before there was a successful design of the article. There must be a discernible event and date when the design is known to be completed and the designer knows that the one-year bar period has started to accrue.

Consideration of the totality of the circumstances includes considering whether the subject matter of the patent had been shown to be satisfactory for its intended use or whether it was still undergoing evaluation and changes. *Seal–Flex, Inc. v. Athletic Track and Court Construction*, 98 F.3d 1318, 1323, 40 USPQ2d 1450, 1453 (Fed.Cir.1996); *Baker Oil Tools Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1563, 4 USPQ2d 1210, 1213–14 (Fed.Cir.1987). For design patents, as for utility patents, the totality of the circumstances standard requires consideration of whether the design is completed, such that it

is a useful design for an article of manufacture. If the article can not be manufactured due to its design, the policy of the on-sale bar is not served by nonetheless accruing the bar while the design is still being modified. There is no reason to treat design and utility patents differently. *See* 35 U.S.C. § 171; *cf. Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 1200, 31 USPQ2d 1321, 1326 (Fed.Cir. 1994). The nature and effect of the changes made in the patented subject matter is part of the totality of circumstances, *see Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1576, 35 USPQ2d 1840, 1844 (Fed. Cir.1995) ("[w]hether future improvements were contemplated or necessary is indeed relevant, for experimental use is determined on all the evidence"). Such considerations are as relevant to design patents as to utility patents.

The totality of the circumstances does not rise and fall with any single consideration; it is determined on all the facts. Evidence of experimentation or modification is part of the totality of the circumstances. As this court stated in the context of the public use bar of § 102(b): "It is incorrect to ask: 'Was it public use?' and then, 'Was it experimental?' Rather, the court is faced with a single issue: Was it public use under § 102(b)?" *TP Laboratories, Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir. 1984); *accord, Tone Brothers*, 28 F.3d at 1198, 31 USPQ2d at 1325. This principle equally applies to the on-sale bar. When an inventor succeeds in interesting a potential customer in the concept of a design, but no sale can occur unless the article as designed is useful for its intended purpose, this is a critical consideration and can not be ignored.

The policies embraced in the totality of circumstances standard are ill-served by removing design patents from the established law of § 102(b). These policies, discussed in *General Electric Co. v. United States*, 228 Ct.Cl. 192, 654 F.2d 55, 211 USPQ 867 (1981) (*en banc*), include the following: First, there is the "policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity"; this policy is not served by accruing the

bar while the design is still being changed. Second, there is the policy favoring "prompt and widespread disclosure of new inventions to the public"; this policy is unaffected when the design is for an unmanufacturable article and requires modification before the article can be manufactured. A third policy is to "prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized [ ] period"; this policy is not of practical significance for design patents, for the life of a design is rarely as long as the patent life. As the court remarked in *Jack Adelman, Inc. v. Sonners & Gordon, Inc.,* 112 F.Supp. 187 (S.D.N.Y.1934), "designs and patterns usually are short-lived and with the conditions and time incidental to obtaining the [design] patent, this protection comes too late, if at all." In contrast, the fourth and dominant policy in this case is that which gives the inventor a reasonable amount of time following completion of the invention to ascertain its value in the marketplace, thus saving the cost of filing patent applications for unsuccessful inventions.

The panel majority cites the third policy, stating that "[a]pplying experimental use negation in the design patent context would allow entities to increase the life of their design patents merely by tarrying over the production of the article of manufacture." I doubt that a manufacturer will "tarry" in production in order to delay a design patent's expiration. Indeed, in the case at bar the district court expedited its judgment because of the limited commercial lifespan of the design in suit:

> As an initial matter, the Court notes Continental's contention that container designs such as the one in issue have limited commercial "lifespans." Continental therefore appears to have an interest in prosecuting as expeditiously as possible its appeal from the Court's entry of summary judgment. . . .

*Continental Plastic Containers, Inc. v. Owens–Brockway Plastic Products, Inc.,* No. 95 C 4670 (N.D.Ill. July 10, 1996) (Agreed Order and Final Judgment), slip op. at 5–6.

Continental states that its post-critical-date changes in the design were significant to manufacture of the bottle, although the product retained the general appearance of the prior design. The effect on the ornamental appearance is a factor to be considered, but it is not the only factor. In this case there was evidence that the modifications in the details of the design after the critical date converted a useless design into a design that was useful for its intended purpose. Had Continental not succeeded in modifying the design so that it could be manufactured, the sale could not have been completed, no matter how many orders had been written. The design that worked did not exist until after the critical date. In *Tone Brothers* this court held that "experimentation directed to functional features of a product also containing an ornamental design may negate what otherwise would be considered a public use within the meaning of section 102(b)." 28 F.3d at 1199, 31 USPQ2d at 1326. This reasoning is fully applicable to on-sale events. It is incorrect to charge Continental with knowledge or notice that in the midst of the changes it was making in its flawed design, the bar period started to accrue. The critical date can not be constructed with "judicial insight based on hindsight." *Seal–Flex,* 98 F.3d at 1323, 40 USPQ2d at 1453. It must be recognizable when it occurs, so that the inventor knows the date of the forthcoming legal deadline.

As for all inventions, the critical date for a design patent arises when the completed design has been shown to be useful for its intended purpose. A drawing or model of the article does not start the § 102(b) bar when the article as designed is not capable of manufacture. Such a design is not useful for its intended purpose, for even if a potential customer is sufficiently interested to place an order, as here, the order could not be filled by the design as it was shown to the customer. Whether or not the ensuing changes in the design are "minor" from the viewpoint of the observer of the bottle, if it can not be manufactured until changes are made the design is not suitable for its intended purpose.

Thus I must dissent from the court's new rule that the on-sale bar for a design patent invariably runs from any sales event accom-

panying the initial drawing or model, whether or not modifications are later required in order to produce a useful design. The principles of law should not be so different for design patents and for utility patents. The totality of the circumstances must be considered, including experimentation, modification, and development of the design of the article of manufacture in order to achieve the intended utility of the designed article.